**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**GAINESVILLE DIVISION**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
|  | ) |
| Plaintiff, | ) Case No: 1:21cr6 |
|  | ) |
| v. | ) Gainesville, Florida |
|  | ) July 24, 2023 |
| MOHAMED FATHY SULIMAN, | ) |
|  | ) 3:04 PM |
| Defendant. | ) |
| _____ | ) |

**TRANSCRIPT OF SENTENCING HEARING**
**BEFORE THE HONORABLE ALLEN C. WINSOR**
**UNITED STATES DISTRICT JUDGE**
**(Pages 1 through 54)**

*LISA C. SNYDER, RPR, CRR*
**Official United States Court Reporter**
**111 North Adams Street, Tallahassee, FL 32301**
**(850)567-1374 * lisasnydercr@gmail.com**

*Proceedings reported by stenotype reporter.*
*Transcript produced by Computer-Aided Transcription.*

APPEARANCES:


For the Plaintiff:          United States Attorney's Office
                            By:  DAVID P. BYRON
                                 Asst. U.S. Attorney
                                 david.byron@usdoj.gov
                            401 SE First Avenue, Suite 211
                            Gainesville, Florida 32601


For the Defendant:          Fritz Scheller PL
                            By:  FRITZ JOSEPH SCHELLER
                                 Attorney at Law
                                 fscheller@flusalaw.com
                            200 E. Robinson Street
                            Suite 1150
                            Orlando, Florida 32801

                            Constitutional Law Center for
                            Muslims in America
                            By:  CHARLES DAVIDSON SWIFT
                                 Attorney at Law
                                 cswift@clcma.org
                            100 N. Central Expressway, Suite 1010
                            Richardson, Texas 75080

**P R O C E E D I N G S**

(Call to Order of the Court at 3:04 PM on Monday, July 24, 2023.)

THE COURT:  Good afternoon, everyone.

Have a seat, please.

MR. SCHELLER:  Thank you, Your Honor.

THE COURT:  All right.

We are here in case 1:21cr6.  It's United States versus Mohamed Suliman.

Mr. Suliman is here this afternoon.

Good afternoon, sir.

THE DEFENDANT:  Good afternoon.

THE COURT:  And he is represented by Mr. Scheller. Nice to see you, sir.

MR. SCHELLER:  Good afternoon, sir.

THE COURT:  Go ahead.  You must be Mr. Swift.

MR.SWIFT:  I am, Your Honor.

THE COURT:  You got your pro hoc order today.  I don't know if you saw that.  But you are now admitted and welcome.

MR. SWIFT:  I did.  Thank you.

THE COURT:  Mr. Byron is here for the government.

Good afternoon to you as well.

MR. BYRON:  Good afternoon, Your Honor.

THE COURT:  And Mr. Billig is here for probation.

Is everybody ready to begin?

MR. SCHELLER:  Yes, Your Honor.

Just as a preliminary matter, Mr. Suliman insisted that I advise the Court he was not able to get a haircut or a beard trim at the Dixie County Jail.  And he has tried and I have tried for the last two months.  In fact, he has called me 16 times since last Wednesday to get it done.

He wants this Court to know it's not a sign of disrespect for him.  It was very important that he pay honor to this Court and wanted to have that done before today.  It was beyond his control, trust me.

THE COURT:  I understand.

Thank you.

All right, Mr. Suliman, before we get any further, I must ask if you have had a chance to go through the presentence investigation report with your lawyers.  Have you done that?

THE DEFENDANT:  Yes.

THE COURT:  Okay.

And were they able to answer any questions you had about that?

THE DEFENDANT:  Yes.

THE COURT:  Do you have any more questions?

THE DEFENDANT:  No.

THE COURT:  You saw the addendum as well that went with the presentence investigation report?  It would have been the last page.  Did you go through that as well?

THE DEFENDANT:  Yes.

THE COURT:  Very good.

You do have, Mr. Suliman, what's called the right of allocution, so you will be permitted to address the Court later in the proceeding if you'd like.  That's to tell me anything you'd like in mitigation of your sentence.  You don't have to do that.  Some do and some don't.  I anticipate that your lawyers will make a presentation on your behalf.  I will circle back to that later in the hearing.

I will note for the record that I have reviewed the presentence investigation report.  I have also seen your sentencing memorandum, Mr. Scheller, and the many letters that went with that.  I always review all the letters, and I did that in this case.  And I noted you had one additional one today, so that's been docketed, and I have reviewed that as well.

I have also seen the report that you had prepared by your expert.  And I don't believe that was attached to the presentence investigation report; is that right?

THE PROBATION OFFICER:  It was shared with myself and the government.  I just forwarded it to the Court.

THE COURT:  Okay.

I have seen that.  We will have that filed under seal so it will be part of the Court record.

Okay?

MR. SCHELLER:  Thank you, Your Honor.

As to the letter, I apologize. I just received it today.

THE COURT: The last letter?

MR. SCHELLER: The last letter.

THE COURT: Oh, that's fine. That happens from time to time. So that's certainly fine.

Okay.

Anything we need to address before we go the usual route, Mr. Byron?

MR. BYRON: Your Honor, I did discuss with the defense this morning, and we had previously discussed this as well -- I also raised it with probation when we met on the case -- that we do intend to provide argument to the Court regarding application of the terrorism enhancement under Section 3A1.4. I just wanted to make the Court aware of that.

I realize I did not file a formal objection. I apologize for that. It was simply because I had previously relayed the government's position to probation and the defense.

THE COURT: Okay.

So you do have an objection to the guidelines as calculated then?

MR. BYRON: Your Honor, we would -- yes.

We would suggest that the application of the terrorism enhancement in this case would be appropriate.

I don't intend to present any witnesses. And the only

case law that we will be referring is the *Arcila Ramirez* case which is cited in a footnote at page 8.  I am just briefly going to refer to the standard that is laid out by probation there in reference to the facts.

THE COURT:  Okay.

And I assume you would object to adding that or -- you are going to handle that, Mr. Swift?

MR. SWIFT:  I am going to handle that portion, yes, the first part.

We would object under Rule 32(f) that a written request is required under the rules.  And for that reason, we don't have written, although I am -- I will also note that the government informed us, and I am prepared to argue on it if necessary.

I will note, for the record, an objection to begin with.

THE COURT:  So your procedural objection, though, on the -- on the not filing something written -- it would have been helpful for me to be prepared in that regard, too.  But you did have notice that this was --

MR. SWIFT:  We are prepared.

THE COURT:  Okay.

But I mean, he provided you notice that they were going to --

MR. SWIFT:  Yes.

THE COURT:  All right.  Okay.

Well, then, what we will do -- why don't we address that first, Mr. Byron?

MR. BYRON:  Yes, Your Honor.

May I approach the podium?

THE COURT:  Yes, sir.

MR. BYRON:  Your Honor --

THE COURT:  What was -- what was the thinking behind not just filing that?  You know, I could have done research and things like that.  That's a little out of character for your office.

MR. BYRON:  Yes, Your Honor.

I can't speak to the decision not to file a written memorandum as to the application of the sentencing enhancement in this case.

I discussed with my office after inheriting this case, and they advised that the best course of action would be to make oral argument solely to the Court.

THE COURT:  Okay.

I have got 3A1.4 here in front of me.

So you can begin.

MR. BYRON:  Yes, Your Honor.

So we would submit to the Court the terrorism enhancement, laid out in Section 3A1.4, does apply to the defendant's conduct in this case.

I would note at the outset that there is -- this is certainly not the standard case in which a terrorism enhancement would apply.

At the outset we note that the existence of the terrorism enhancement necessarily indicates that there must be some cases in which a defendant can commit this crime and not qualify for the terrorism enhancement.  And so I think the key issue here is looking at the defendant's state of mind.

The case that's cited by probation in the PSR, the *Arcila Ramirez* case, focuses on the defendant's calculated effort to retaliate against or interfere with or coerce a government.

The terrorism enhancement can also be applied when the defendant commits an enumerated offense under 2332 subsection (g)(5)(B), which provision of the materials support to a foreign terrorism organization qualifies.  And the defendant also is calculated in his effort to influence or affect or retaliate against a civilian population.

So looking at the application of that standard to this case, I would note, Your Honor, that there are a number of facts that are not in dispute.  And I think these are very important to state upfront because these are areas where the defense and the government have discussed quite extensively, and we have incorporated these into the statement of facts.

We all agree that the defendant suffers from Bipolar I

disorder.  And I think the report of Dr. Danziger adequately lays out the seriousness of that disorder.

We would note for the record, and I think this is consistent with the statement of facts, the defendant did not post or repost materials supportive of ISIS's acts of violence.

There is no evidence that the defendant reposted images of beheadings or explosions.  That was not something that was collected during the course of the investigation.

The defendant also did not make any overt statements that were collected during the investigation supporting acts of violence committed by ISIS.  That's something that we have investigated and discussed with the defense as well.

Generally, the statements that were made by the defendant in the course of the investigation, which included review of the defendant's email accounts and some social media, dealt with going to live in a Muslim afterlife or paradise, and there were some statements and chants that celebrated Muslim fights against oppressors.

We would submit to the Court that --

THE COURT:  There were?

MR. BYRON:  There were chants that celebrate fights against oppressors of the Muslim people.

THE COURT:  There were chants in the email -- what do you mean?

MR. BYRON:  Correct, Your Honor.

They were located in draft emails within the Google account that belonged to the defendant that were located during the course of the investigation.

THE COURT:  These were what?  Like written chants or audio or video or something?

MR. BYRON:  I believe they were -- some were audio and some were written.  And these were chants delivered by other individuals that the defendant presumably read.  We didn't have evidence that he intended to disperse those or send them to other people.

THE COURT:  Okay.

MR. BYRON:  I would note for the Court that the chants didn't differ significantly from some of the Christian hymnals that you would see from the time of the crusades.  It's not something that was so beyond the pale as to constitute an advocacy for the heinous acts of violence that ISIS was committing in 2014 when the defendant traveled to -- or attempted to travel to Syria.

Now, the facts that we would submit to support application of the enhancement would deal primarily with what the defendant knew when he traveled, or attempted to travel, to Syria in 2014.

We all agree that the defendant's sole provision of support to ISIS would have been in the form of either personal support or potentially financial support.  He made some

statements about his father potentially sending some money and the defendant turning that money over to ISIS.

I would note that at the time that the defendant decided to attempt to enter Syria, ISIS was in the midst of war. They were in the midst of committing some truly heinous acts of violence, war crimes in some cases, and that included taking the homes of civilians and enslaving some individuals.

The timing of the defendant's attempted entry into ISIS, therefore, I think is important.

In May of 2014, the Secretary of State designated ISIS, or ISIL at the time as it was known, as a foreign terrorist organization.

That designation followed some very well-publicized attacks that ISIS committed against Syrian civilians. And the basis for that designation, those attacks, was made public about a month before the defendant left for Syria.

And I think the defendant also made statements through his interview with Special Agent David Collins of the FBI that he had an attraction to dangerous war zones, although he attributed that to his bipolar -- being in a manic phase of bipolar.

So regarding his mental illness and the timing of his actions, the government would submit that while we agree his mental illness is serious, and we think the report of Dr. Danziger is well taken, he did clearly have agency over his

actions in some respect at the time he attempted to join ISIS.

While it was episodic and serious, these manic phases of the defendant's bipolar, it did not impair his ability to plan his travels, to create a false story about the purpose of one-way flights, to change his flight in Turkey, to dispose of his cellphone in Turkey, to locate a hotel and a driver in Gaziantep, and to leave for the border under the cover of darkness in an attempt to illegally cross into Syria.

And I think the sheer amount of planning and deliberation shown in his efforts to enter Syria strongly militates in favor of the Court concluding that he did have the agency necessary to make these decisions in an effort to avoid detection.

It's also important to note here that while the defendant has stated that he had no interest in furthering the violence perpetrated by ISIS -- and that is a fact that's stipulated in the statement of facts -- we do not have direct evidence to contradict that.  So I want to be very clear that we agree with what has been signed and submitted in the statement of facts, but the defendant did advise that he was entering an active war zone.

He advised that he had researched groups, including ISIS, prior to traveling overseas.  And it is reasonable to assume that he would have come across information about the true actions committed by ISIS during that research.

And I think the defendant actually made statements to that effect in which he indicated that he believed that the statements about ISIS's violent conduct was essentially propaganda which was used to discredit ISIS.

In his statement to Special Agent Collins in Khartoum in 2018, the defendant indicated that he was going to Syria in order to see the war. And notably, here he did not state that he was going to Syria to complete and live in accordance with the five pillars of Islam, for example, which require, among other things, tithing and the care of widows and orphans.

He did not state that he was there to support well known Muslim service organizations such as the Red Crescent.

While he blamed his intent on the bipolar disorder, and we certainly agree that he was suffering from bipolar at that time, he was quite clear in his intent to support ISIS and his knowledge that this was during a time of war.

THE COURT: Okay. Go ahead. I'm sorry.

MR. BYRON: Yes, Your Honor.

The defendant has suggested to the Court in the sentencing memorandum from the defense that he intended to join ISIS in order, effectively, to live in an idyllic Islamic paradise while providing translation and financial support for ISIS for their media wing.

Now, the two problems with that are, again, the defendant had previously stated that he was aware that a war was

being fought in Syria, which I think arguably conflicts with the account that he intended to live peaceably there.

The second is if he had actually been successful in providing support to ISIS's media wing, the defendant would have engaged in the support of a very effective and violent media campaign.  One of the most effective in recent history.

The reality is that ISIS used its media wing to depict sharia punishments as a sales pitch designed to radicalize people into joining ISIS as fighters.  And it dispensed videos of serious and heinous violence through the Internet through this media wing that the defendant intended to support through translation services.

And I think it's fair to say that without the numbers of foreign soldiers that ISIS accrued through this media campaign, they would not have advanced as far as they did.

And so I would argue that the support of ISIS's media wing, even if that is what the defendant actually intended to do, would still constitute an effort designed to influence or affect government conduct or to retaliate against government conduct.

And perhaps more overtly to --

THE COURT:  Can you take a step back and tell me how this fits in?  I am looking at the guideline.  It says you increase by 12 levels, or in this case, more than 12 levels, I guess, if the offense is a felony that involved or was intended

to promote a federal crime of terrorism.

And then the commentary says, *Federal crime of terrorism* is what's in 2332b(g)(5). And this is what you were saying is *calculated to influence or affect the conduct of government by intimidation or coercion.*

That's what you are saying?

MR. BYRON: Yes, Your Honor.

THE COURT: All right. I am with you now.

So his conduct is to promote an offense that was calculated to influence or affect the conduct of government by intimidation or coercion or retaliate against the government.

MR. BYRON: Correct, Your Honor.

THE COURT: All right.

MR. BYRON: So I think, to get right to the point, the question here really comes down to that definition of calculated. What did the defendant calculate to do, and how do we interpret that?

If the defendant's calculation and effort and intent was to promote ISIS through its media wing and to work as a translator under the belief that ISIS was simply perpetuating a peaceful Islamic state within Syria, does that qualify for the sentencing enhancement?

And I think that what we are really looking at here is an intent requirement, which means that the Court can make a determination based on inferences and reasonable inferences from

the defendant's actions.  Specifically, that the defendant intended to -- or, excuse me -- planned to influence, affect, or retaliate against government conduct even if that was not his personal motive.

So, Your Honor, I think that looking at this case, the strongest evidence that would suggest the enhancement is appropriate would be, again, the fact that the defendant admitted that he knew he was entering a war zone at the time that he would be providing support to ISIS, even if it's non-violent support.  And he admitted that he had researched which groups he would seek out upon crossing the border into Syria.

As I mentioned, it's very reasonable to believe that just a month after ISIS was designated a foreign terrorist organization, the defendant would have come across information during that research describing the fact that ISIS was engaged in federal acts of terrorism.

THE COURT:  But he says he did and didn't believe it, though, right?  Your burden would be to prove that he knew that that's what was going on, correct?

MR. BYRON:  That's correct, Your Honor.

THE COURT:  And it sounds like you are just saying it would be reasonable to believe that he could have or something.

MR. BYRON:  Your Honor, the evidence before -- the evidence that was discovered during the course of the

investigation would not show a direct statement from the defendant contradicting what's contained in the statement of facts. I do want to be clear about that.

There is no statement that I am hinting at where the defendant said: I do, in fact, know that they are committing terrible acts of violence, and I intend to support those.

The government's argument is, looking at the reasonable inferences from his conduct, it's highly likely that he would have seen this information and would be aware, on top of the fact that he knows he is entering a war zone, that ISIS is at least reportedly committing terrible acts of violence. And therefore, his specific intent, his calculated intent to support ISIS, even if he claims that he will only support a non-violent portion of ISIS, would go towards furthering the overall goal of ISIS, which is to commit federal crimes of terrorism.

Your Honor, I would say, in summary, by attempting to provide those personal and potentially financial services to ISIS, the government would argue that he intended to promote ISIS at a time when ISIS was committing federal acts of terrorism. And, consequently, there is a reasonable inference that he was aware of that and that the terrorism enhancement should apply here.

THE COURT: What's your response to his point about the Rule 32 violation?

Here is the situation, Mr. Byron:  I have put a lot of time preparing for this.  I didn't know this was going to be a disputed issue.  No one raised it.

This case has gone on for an extremely long time.  We are at the point where the expectation was it would be over today, the sentence would be imposed, and this is a substantial request from the government.

The guidelines right now are -- the offense level is 23.  This would be a 12-level increase.  I said more -- I was thinking the offense level was lower a minute ago, but it says it would go to 32 at a minimum.  It would go to 35.  So the guidelines would go from 46 months to 57 months up to 168 months to 210 months.  That's a substantial difference.  This is a large ask.

And I'm a little taken aback by the fact that there wasn't a writing on that, something that would allow me to be prepared.  There is a lot of facts here.  You asked for a lot of inferences from a lot of facts that may or may not be agreed to. I suspect there is law on this.

It puts us in a difficult situation here.

Why would I not just say it's overruled because it wasn't properly raised?

MR. BYRON:  Your Honor, all I can say to the Court, in defense, is that we had discussed this substantially with the defense prior to sentencing today, and I discussed it with

probation.  The Court is right, we should have filed notice.  And I apologize for that, Your Honor.  My understanding was that everybody was on the same page, that we would be litigating this issue, but I completely understand the Court's point.

THE COURT:  Well, I mean, it's great that the parties have notice to litigate, but there is a lot to this.  I don't know that this is something that I could resolve in the next couple of hours.  I mean, you also have the *Dupree* issue on top of that.

Let me hear from -- it's Mr. Swift, right?

MR. SWIFT:  That's correct, Your Honor.

THE COURT:  Let me hear from you.

MR. SWIFT:  32 is well taken because it puts the Court on notice, and this is a technical argument.

The government starts with two things that are correct:  The government is correct that the terrorism enhancement does not apply to every terrorism case, and the government is correct on the calculated standard.

Where the government starts to run awry --

THE COURT:  What is the calculated standard?

MR. SWIFT:  The standard that the intent of the offense must be calculated to influence government conduct either through violence or other means.  The focus is government conduct on this.

Probation was correct.  Probation looked at the

*Ramirez* standard.  They didn't cite the leading case because it's not an Eleventh Circuit case.  But this question has come up before.

THE COURT:  What's the leading case?

MR. SWIFT:  The leading case is the *United States versus Alhaggagi,* U-S, A-L H-A-G-G-A-G-I, 978 F.3d 693, Ninth Circuit 2020, which follows out of the *Alwan* series.  *Alwan* is cited in *Ramirez*, this debate, it's been going on for about 15 years.

To let the Court know, I'm here because this is what I do.  I joined on the team when this became clear.

THE COURT:  You are here for this issue?

MR. SWIFT:  For this issue.

THE COURT:  Okay.

MR. SWIFT:  I've been working on the terrorism enhancement for 15 years.

THE COURT:  Well, why didn't you all file a memorandum on this issue?

MR. SWIFT:  Pardon?

THE COURT:  Why didn't you all file a memorandum on this --

MR. SWIFT:  Because it hadn't been raised.  I have nothing to object to.  I would be objecting to myself.  I thought they were appropriate.

THE COURT:  Well, I mean, you could -- I am not saying

you should have done this, but it could have been, Hey, the government has indicated to us they are going to present this at sentencing.  I want the Court to be prepared.  Here is why probation is correct.  These are the cases the Court ought to read.  Here are the facts that are not in dispute.  Here is why the government's inference on these facts would be an unreasonable inference, and here is why I should win this issue.  But we are where we are.  Go ahead.

MR. SWIFT:  I understand.

*Alhaggagi,* this case out of the Ninth Circuit -- and they all fall from the *Alwan* series on this -- *Alhaggagi* also on ISIS.  *Alhaggagi*, unlike other ISIS cases on personnel or services, involved speech.

In Mr. Alhaggagi's case, which occurred a couple of years after Mr. Suliman's case here -- Mr. Suliman, while we are here into 2023, this was a very early offense in that process.

He provided them bots.  I am not sure the Court is familiar with what a bot is.  A bot is a way in social media to retransmit messages.

By the time Mr. Alhaggagi became involved with ISIS, social media was getting better at shutting them down when they would put these videos up or whatever.  So what he did was he created bots for them, these robotic things that would retransmit accounts and broadcast.  They are much tougher to shut down.  And you can amplify your message, and it's more

likely to be seen because Twitter and Facebook and all those guys, they look at how many times something is being talked about.  So he provided bots.

The Court originally, following much the same argument as given by the government here, applied the enhancement.  The Ninth Circuit Court of Appeals reversed.

The Ninth Circuit Court of Appeals noted that speech, these translation services or bot services, could be utilized either way.  It could also -- and all of ISIS's speech -- this is why, and it's stipulated, in part, that through word of mouth, social media post and messages were spreading a lot about a Nirvana place as well, which would clearly not qualify.

So you have one set of speech, which is terrorizing type speech, that would qualify, and another set of speech that wouldn't.  And the Ninth Circuit said, under those circumstances, since the burden is on the government, we cannot conclude that it was clearly foreseeable to the defendant how his translation services would be used.  And that under those standards, the terrorism --

THE COURT:  He is asking me to make the inference that they would be used to support what everyone knew at the time was terroristic activity, right?

If Mr. Suliman knew that ISIS was committing acts of terrorism that met this definition that were designed to influence other countries -- and I guess, you are not disputing

that aspect of things, right?

MR. SWIFT:  I am disputing -- in their statement of facts, he believed that that was propaganda against them.

THE COURT:  I get that.  You are not disputing if there were a finding that he was trying to assist ISIS in what people now know ISIS was doing that he says he didn't know they were doing.  But if he did know they were doing what they were doing and he was signing up to assist them, then he would meet this standard, right?

MR. SWIFT:  Well, in the *Alhaggagi* case, they didn't, because as he didn't know -- as they pointed out, Mr. Alhaggagi couldn't know which way the bots would be used.

THE COURT:  But it would be supporting the organization.  I mean, that's the trigger.

MR. SWIFT:  That's the trigger on 2339B you see.  We have to take a step back.

Supporting the organization -- if Mr. Suliman had fed orphans under ISIS's direction and control, he is guilty of an offense.  If he binds a wound under ISIS's direction and control, he is guilty of an offense.  It doesn't matter whether it's good or bad.  That's humanitarian law that Congress forbid all assistance.  And Mr. Suliman is in this court because he agreed that he was going to help ISIS.  That was his intent.  And as soon as -- in that process, he would be guilty of an offense no matter what his intent was in the way that he was

going to help.

Why there is a subsection -- because the government essentially is arguing to Your Honor that everybody -- they acknowledge there is an exception, but it doesn't seem like there would be a way for there to be such an exception because everything that aids ISIS ultimately aids ISIS, and ISIS is engaged in these activities.  It's a circular argument.

What we look at it is the particular form of support that is provided and whether it furthers those things.

That's why in Alhaggagi, when a bot was provided, which could be used either way -- and I think that really distinguishes it from *Ramirez.*

*Ramirez* was originally sent back and, in 2023, came back.  And again, the enhancement was applied.  But in *Ramirez's* case, he was providing guns.  Kind of hard to think of a non-neutral way to use a gun, right?  It was foreseeable that those guns, whether he continued -- I think they will use them for something.  No.  Guns fell to the general message, and the Eleventh Circuit upheld it the second time after specific testimony and findings.

But translation is not that way at all.  Certainly translation services, we can envision how they could be used to do those things.  We can also envision how they could be used for things that were not in line with influencing the government by violence or threat of violence.

And it's difficult.  We have to remember that we are talking about ISIS back then rather than ISIS now.  ISIS now is synonymous with these things.  But ISIS back then, as it was early being designated, was not well known, in part.

While he was aware of some things, he disbelieved them.  And that's in the stipulation of fact.

So when we look at it, we find ourselves in this service that can be used either way.  And we don't have anything, as the government points out, just as we had in *Alhaggagi,* to indicate that he has an intent that his translation services be used in any particular manner.

If we had that -- but here, the burden is on the government in such a -- in these parts, and the government has not met that burden as probation found here.

The whole of it, the terrorism enhancement should not apply in such a case.

They are rare, Your Honor.  I have been doing this for a long time.

THE COURT:  They are what?  What did you say?  I'm sorry.

MR. SWIFT:  The cases where it does not apply are rare.  Most of the time it will.

THE COURT:  Most of the time this enhancement will apply?

MR. SWIFT:  Yes.  Most of the time it does.

THE COURT:  What do you mean?  In most cases involving this statute of offense that he is dealing with here?

MR. SWIFT:  Yes.

In most cases.  But there are cases where it has not, in part.  And generally, those have been in the speech category case.

The government did argue money, but that's something that I think Your Honor needs to set aside, because he didn't plead to money, and the terrorism enhancement is offense specific.

Now, it is also an error to find, well --

THE COURT:  He wouldn't have to plead to money.

I mean, if he --

MR. SWIFT:  Actually, I disagree with Your Honor on that.  He would in this process because this particular enhancement is not -- like most of the guidelines, is course of conduct.  The terrorism enhancement is offense specific.

THE COURT:  Where does it say that?

MR. SWIFT:  In the text.  And it has been so found. It's not a course of conduct.  The offense in part was calculated as we go down through.  The offense itself was calculated, and courts have interpreted that to be offense specific in this process.  That also happened in *Alhaggagi,* an error.

THE COURT:  The assistance here is to provide --

MR. SWIFT:  What he pled to is translation, yes.

THE COURT:  What he pleaded to was attempt to provide assistance, right?

MR. SWIFT:  Personnel.  Attempt to provide support in the form of personnel in the form of himself.

THE COURT:  That's not a -- I mean, that's not a statutory offense.  The offense was provide assistance, right? If instead -- if there were different -- is it not?

MR. SWIFT:  It -- absolutely.  That is one of the listed means of material support.  Material support lists -- has a laundry list.  Personnel is a specifically designated list.

THE COURT:  Hang on.  Let me get with you here.  Maybe I am misunderstanding something.

Give me one moment to get something in front of me here.

(Pause in proceedings.)

THE COURT:  Maybe we are not communicating well. Looking at the statute of conviction here is 2339B(a)(1), right?

MR. SWIFT:  Yes.

THE COURT:  And it says -- I will paraphrase here -- whoever provides material support or resources to a foreign terrorist organization, or attempts to, is guilty, right?

MR. SWIFT:  Yes.

THE COURT:  And material support or resources could be money, right?

MR. SWIFT:  It's defined -- it has two different definitions, and it is specifically defined.  It's defined at 2339A in their listing.  And "personnel" is actually defined in the statute below.

Personnel, which is what he pled to, is defined as acting under the direction and control of the organization.  The statute was not constitutional without that definition.

THE COURT:  This has the same definition, and it cross-references another statute here.

You are saying that --

MR. SWIFT:  The definition of "personnel" is in 2339B.

The definition of "all other forms" is in 239A -- 2339A.

THE COURT:  2339 big A?

MR. SWIFT:  What's that?

THE COURT:  You are saying 2339 big A?

MR. SWIFT:  Big A has the definition.

For the purposes of this count, he pled guilty to 2339B, the personnel section.  He was charged with personnel.

THE COURT:  I guess I am not seeing what you are saying.  He was charged with providing material support or resources, as that term is defined in 2339A(b)(1), including personnel.

MR. SWIFT:  Right.

THE COURT:  And then B(1) means any property tangible

or intangible, including currency.

MR. SWIFT:  Your Honor, respectfully, in this part, he did not -- and the government acknowledged in our negotiations -- did not plead guilty to currency.

THE COURT:  Currency.  But what I am saying is -- and maybe it doesn't matter.  Maybe we are on a rabbit hole.  But currency is not an offense.  The offense is providing material or support or resources, which is what he pleaded guilty to, and that term includes money.

So if he didn't provide money, then, fine, he didn't provide money.  But your point was he wasn't charged with that, and I don't see how he would have been charged differently if it were money.  Maybe the facts are different.

MR. SWIFT:  He would have been charged with providing material support in the form of currency.  It has to be listed.

THE COURT:  It has to be listed in the indictment.

MR. SWIFT:  Yes.

THE COURT:  Says who?  Is that an *Apprendi* issue?  Is that what you are saying?

MR. SWIFT:  What that issue is -- no.  It's not a*n* *Apprendi* issue.  It's a specificity issue to know which of the forms of support are sufficient.

Simply charging material support, period, without saying what form lacks the specificity as found by multiple courts in it.  So they charge the form --

THE COURT:  It would be a pleading deficiency under Eleventh Circuit law?

MR. SWIFT:  I don't know under Eleventh.

THE COURT:  Okay.  Well, we are under the Eleventh Circuit.  I don't think that's correct, and maybe it doesn't matter.  I mean, if you are saying there is no evidence of money, then that's, I guess, probably the better answer.  But I don't know that -- if the theory of the government's case was he provided money to ISIS, and they charged it exactly the way it's in this indictment, I don't think that would be deficient.  But -- so we may just agree to disagree on that.

MR. SWIFT:  Well, the stipulation of fact was to personnel.

THE COURT:  Okay.  But not to -- it was not to not money.  In other words, there is no stipulation that there was not money involved.  You're just saying they just don't have evidence to the contrary; is that right?

But they can present evidence to the contrary at a sentencing hearing.

MR. SWIFT:  I disagree on that, but Your Honor will do a part on it.  I believe that it's offense specific.  The offense he pled guilty to was personnel.

We talked at length --

THE COURT:  That's not what an offense is in the Eleventh Circuit.  Okay.  But --

MR. SWIFT:  This is one of those points, I guess, where I wasn't put on notice.  Because my understanding from the government, when I had talked to them, was they were not seeking anything under the finances.  And now I am not --

THE COURT:  By "seeking anything," you mean what?

MR. SWIFT:  They weren't seeking the enhancement under the finance theory.

THE COURT:  Okay.  And maybe Mr. Byron can clarify this, but I am not sure they are.  Was that sort of an alternative to an alternative?

What's your position on that, Mr. Byron?

MR. SWIFT:  Pardon?

THE COURT:  I am asking Mr. Byron what their position is on the money.

MR. BYRON:  Your Honor, I apologize for opening a can of worms.

I was referencing the fact that in Mr. Suliman's statement to Special Agent Collins, he indicated that the resources that he intended to provide would be translation services and potentially --

THE COURT:  No.  I get that.  But it is your -- when you were talking about the statements he made to Mr. Collins that dealt with money, was that to say that's an alternative basis to succeed under this enhancement from the government's perspective, or is that an, Oh, by the way, for sort of color,

there was this money aspect of things?

MR. BYRON:  Correct, Your Honor.  It was just for completeness in the discussion.  It was not an alternative theory.

THE COURT:  All right.  Well, then that resolves your issue.

MR. SWIFT:  Okay.

THE COURT:  Okay.

MR. SWIFT:  So what it would come down to, again, on translation, what we put is that translation services are not clearly, in and of themselves, calculated.  So the offense in providing personnel for translation service does not, in and of itself, do it.

Under the circumstances, there are two alternative ways in which it can be used.  Courts have found that in that position, specifically the *Alhaggagi* case, that the enhancement does not apply, that they are not translation services.  They are not inherently violent in their nature.  They lack a lot of that part of it.  And they could be used, particularly by this organization, as the Ninth Circuit noted, in different ways because they did not solely communicate threats.  That later became a large part of their -- back in '14, '15, that was not their only message.

And under those circumstances, our argument is that the enhancement in this unique case -- and they are fairly

unique -- does not apply to this particular case.  And we agree with probation, in part, that the factual -- the record is not sufficient to establish that the offense was calculated to influence government conduct, the offense of providing translation services, the attempted provision.

THE COURT:  Okay.

Going back to the language of the enhancement here, in your view, the offense here is a translation offense?

MR. SWIFT:  Yes.

THE COURT:  Or translation -- and so that would have to be intended -- the translation services would have to be intended to promote a federal crime?

MR. SWIFT:  Yes.

THE COURT:  I understand your position, I think.

Okay.

I misspoke earlier when I was saying what the guidelines would go to because I had overlooked the fact that it would also alter the criminal history category, taking it from I to a VI.  I believe it would make the guidelines 292 to 365 months.  So it would go from, roughly, four years on the low end to roughly 20 years on the low end.  So it's a significant difference.

MR. SWIFT:  It is a significant difference.

THE COURT:  All right.

MR. SWIFT:  And I would close with -- point to the

last part, on page 5 of the facts, that, instead, through word of mouth and person-to-person social media posts and messages that spread widely over the Internet, ISIS claimed it was a welfare state. There were subsidized living expenses such as food, fuel, and paid members a stipend.

At the time of travel, he believed the information about ISIS atrocities was false.

The government doesn't show anything to the contrary.

So in his part, from the defendant's viewpoint, in providing translation services, he would not -- he would not have had that absolute. And ISIS did both. So, you know, both --

THE COURT: Both what?

MR. SWIFT: Did both translated messages in parts that were not threatening to government conduct. That did not do that. That was actually, Your Honor, one of the evil parts about ISIS that made them different. They were treated like a cult, and they were good at recruiting people into this cult. Some people came for the war. Others came for what they thought was some religious, cult-like experience, and he fell into that category.

Under those circumstances, providing translation services is not clearly calculated.

Yes, the government fallback is that it's in a war zone. But translation services wouldn't matter whether he was

there or providing it from here in part on it.

And there were certainly -- it was also the war when *Alhaggagi* was there.  It's what they used their social media campaign to do.  There were atrocities all over it.  There was also all this other information that was part of their campaign.

And given those two parts, we cannot clearly state that he intended to or the offense of providing a personnel or translator was intended to influence the government.

And we got too many -- too far removed for it to apply.

THE COURT:  It's not -- there is a couple of steps here.  His offense would have to be either involving or intending to promote.  And it's kind of a weird stepping to say intended to promote something that is calculated to influence.  Sort of like planning to plan, I guess.

Let me hear from Mr. Byron, unless you have anything further.

MR. SWIFT:  I don't.

THE COURT:  Okay.

MR. BYRON:  Your Honor, candidly, I would rest on my previous argument.  I think that we just have a disagreement here.  There is, unfortunately, no additional evidence I can provide to the Court from the investigation that would, I think, push the needle one way or the other.

The evidence that we have indicating the defendant's

intent is what I have already stated before the Court and so I would rest on that.

THE COURT:  All right.

Here is what I think makes sense:  This is a significant issue -- an extraordinarily significant issue, and I want to get this right.  I am not going to call it a forfeiture, because the government did not brief it, but I am also -- I don't feel I am in a position to apply the enhancement today.

I would want to look at it.  I would want to do my own research on the issue.  It sounds as though it's complicated based on what both sides have said.  I can't say that, as I sit here right now, I completely understand the issue.  And I am not going to make a ruling on an issue I don't completely understand in any circumstance but particularly in one that has a more than ten-year difference in the guideline range.

I guess the statute is capped.  I guess the guidelines would become 15 years, which is the statutory cap if the enhancement applied.

So what I don't want to do is have everyone here and then have everyone come back, but I don't see another plausible way of doing it.

If the government wants to pursue this, they will need to brief it.  And I will give the other side a chance to brief it.  And I will look at that and do some independent research.

Those are the options, probably.  Really, the options

are to continue the hearing, have briefing on this.  If the government wants to pursue that, that would be, I think, the only option.

I realize your option would be to go ahead without the enhancement today.  But, you know, I don't -- I have not had this before where the government's just failed to raise something of this significance.  They really fail to raise things -- it's very rare, as you know, Mr. Byron, for the government to have any objection at the sentencing hearing to the guidelines that wasn't previously raised.

Mr. Scheller, you are standing.  I understand it's not an ideal position from your perspective.

MR. SCHELLER:  I am the most agreeable one here.  I just wanted to ask a favor.  And I understand the Court's concerns.  I am going to ask for a different option today.

THE COURT:  Let's hear it.

MR. SCHELLER:  That you reserve -- you allow briefing.  I think that's warranted based on the circumstances.  I have a number of people here --

THE COURT:  Oh, let me interrupt you.  I was going to get to that.

So I shouldn't have interrupted you because you are probably going to say what I was about to say.

If you have people here who want to speak on character issues and things like that, that would apply regardless of what

the guidelines turn out to be.  I am happy to go ahead with that.

Is that what you were going to say?

MR. SCHELLER:  I was going to ask -- I only have two individuals who want to make a statement.  One of them came from Italy -- actually came from the Congo today, so I want him to speak.

THE COURT:  Let me back up.

You are fine, generally, with reserving on the issue here?  I mean, your preference --

MR. SCHELLER:  I don't see how the Court has another choice, to be honest.

THE COURT:  Okay.

All right.

And you don't object to that, Mr. Byron?  I am asking.

MR. BYRON:  I do not, Your Honor.

THE COURT:  Okay.

So you have people you want to put on?

MR. SCHELLER:  I just want to introduce people that are here.

I am going to have two people speak.

And then we will reserve on the guidelines and the 3553 and Mr. Suliman's allocution.

THE COURT:  That will be fine.

And then at the end of the hearing, we will talk about

scheduling, and I want to -- we will talk about scheduling for briefing and scheduling for the next hearing.

I am mindful we have people who have traveled.  Both the lawyers -- I guess yours is a little easier than Mr. Swift's.

MR. SCHELLER:  Well, there is a man from the Congo who has had it the worst today.

THE COURT:  You are in Tampa, right?

MR. SCHELLER:  I am in Tampa and Orlando, sir.  So I can be here at any time.

THE COURT:  You are not too far.

You don't have any objection to that procedure, Mr. Byron.  Is that right?

MR. BYRON:  No, Your Honor.

THE COURT:  I will say this:  There is no other issues, guidelines issues, loitering out there, correct?

MR. SCHELLER:  No.

THE COURT:  If we come back in three weeks, we are not going to have, Here is a new thing?

MR. BYRON:  No, sir.

THE COURT:  You can go ahead.

Let me ask, Mr. Suliman, you understand what we are talking about here and what's happening?

THE DEFENDANT:  Somewhat, yeah.

THE COURT:  All right.

So we won't complete the sentencing today because there is a legal issue outstanding that's going to be looked into further.

Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  Okay.

You can put on whoever you would like, Mr. Scheller.

MR. SCHELLER:  For the Court's edification, I provided a list of these names to the court reporter ahead of time for the spelling.

THE COURT:  I am sure she appreciates that.

MR. SCHELLER:  Your Honor, in the courtroom today is Mr. Suliman's mother, Nafeesa Khairy.  Would you stand up, ma'am?  She has traveled from Alexandria, Virginia.

Also present is her daughter and my client's sister, Iman Suliman, who wrote a letter to this Court.

THE COURT:  Yes, sir.  I did receive your letter, ma'am.  Thank you.

MR. SCHELLER:  She is a clinical pharmacist who lives in Houston, Texas.

The other person here today is Mujahid Suliman, the brother.  He is a producer that works in New York City.  He came from New York today.

THE COURT:  Thank you.

MR. SCHELLER:  Present in the courtroom, and the

gentleman who came from Rome -- well, came from the Congo via Rome is Mohamed Gafar.  He is the head of digital forensics investigations for the United Nations Food Program.  He is based in Rome, Italy.

Also present is Ismail Ibn Ali, who is a middle school science teacher in Orlando, Florida.

Thank you, sir.

Family relatives who came from Denver are: Mohamed Hamed, who is retired.  Mr. Hamed, thank you for being here.

Osama Abdoon, who is a business owner in Denver, Colorado, who flew in today -- or yesterday.

Abdalla Abdoon, who is a clerk in Denver, Colorado.

Reem Hussein.  She was with the children.  She left.

THE COURT:  I heard some children earlier.

MR. SCHELLER:  Yes.

Khalid Abdoon, who works in Denver, Colorado.

Thank you.

Mohamed Mohamed, who works in Fairfax, Virginia.

Thank you, sir.

Abdelmonim Mohamed, who is retired from Fairfax, Virginia.

Thank you, sir.

Jehan Ornasir, who is a biology teacher in Fairfax, Virginia.

Thank you.

Ibrahim Idrees, who is a college student in Fairfax, Virginia.

And Muhydeen -- I'm sorry.  I am so sorry.  I apologize.  Forgive me, sir.  Muhydeen Suliman, who is the uncle, and he came in from Denver.  I apologize for that.

The two individuals who want to speak today are Iman Suliman, and, obviously, Mr. Gafar, who came from the Congo.

Ms. Suliman?

THE COURT:  Yes, ma'am.  You can step right up.  If you will start by stating your name, and then you can tell me whatever you'd like.

THE WITNESS:  I apologize.  I expected that we were going to complete the hearing today.

THE COURT:  Take your time, ma'am.

MR. SCHELLER:  Your Honor, if the government doesn't object and the Court, may I read it for her?

THE COURT:  That will be fine.

THE WITNESS:  That's okay.  I can do it.

I begin in the name of God, the abundantly compassionate, the constantly merciful.

My name is Iman.  I am Mohamed's younger sister.  I am a pharmacist residing in Texas.  And I am here to speak on behalf of the family.

Your Honor, ever since Mohamed got diagnosed with bipolar disorder, it's been very challenging on our family.

Mohamed and I interacted every single day until he went off to college. And we have had a beautiful friendship, and he has been a supportive and present brother to me.

And at the end of his freshman year of college, I still clearly remember so vividly the day he came home and was telling me a story like he always did, but this time something was off.

He was sitting on the kitchen counter and was speaking rapidly, and I couldn't keep up with the conversation, and he was just erupting with energy. And since that night onwards, as things escalated and we tried to unravel his mental illness, our life as a family has never been the same.

Each stage was hard. Each chapter was harder. But despite all the difficulty that Mohamed has faced, where he could have chosen to become callous and disconnected, his compassionate connected heart always remained. So we, as a family, always remained committed to him.

When he left suddenly, we were shocked. We were confused, upset, hurt. But most of all, we were worried for his health and wanting to help him because we knew the internal challenges he was up against.

We swiftly reached out to the authorities, and we were relieved when he was returned safely in Sudan and began the next

chapter of his life.  But he still continued to experience many hardships and setbacks with his mental health.  It's been painful for our family to see him struggle all of these years.  And many times we, too, were also struggling and learning how to cope with him.

We are not in denial of the situation he has been in, and we have been painfully coming to learn the difference between caring and enabling, and we acknowledge the difference in order to name our commitment in supporting him in a healthy way moving forward.

It's also been a blessing to see Mohamed himself work towards his health.  Despite the difficult environment he has been in jail and struggling with his mental health, I have seen him grow in these last nine months.  I've seen him adopt a routine, work out, and become more attune to his health through mental, spiritual, and physical discipline over the last nine months.

We look forward to having the government and probation support and ensuring Mohamed is able to achieve his goals and fulfill his responsibilities in a healthy environment.

We believe in Mohamed's abilities to succeed as he takes care of his mental health in a wholesome way by taking his medications, by having a routine, by joining support space, and by placing himself in an atmosphere where he can thrive.

We are hopeful that Mohamed will have a steady road

ahead with these equally authoritative and beneficial measures, and we are dedicated to supporting him in achieving that stability.

Mohamed has so much good life ahead of him, and, Inshallah, which means God willingly, he is now at a much different place in life.

Mohamed's five-year-daughter, ██████, who lives in Sudan, sends me videos on a regular basis for her dad.  And Mohamed was already heading down the right track since 2019 when he enrolled and completed two out of three years of his bachelor's degree with highest grades in India in order to provide a better life for his daughter.

Mohamed also cares deeply for our other mom's well-being.  He is my mom's best friend.

Mohamed is committed to and hopes to fulfill the responsibility of taking care of our mom as she gets older.  And his future will be focused on taking care of her and his daughter, and we will support him in that.

I believe I can speak for all the family and friends in this courtroom that are here for Mohamed today by saying that Mohamed is someone who, even if you may not remember what exactly he did for you, you will always remember how he made you feel.

He has an infectious smile, and he has a gentle soul, and he has a big heart that wants goodness for all.

We believe in his good heart, and we will be there to support Mohamed as he makes decisions that will lead him to a healthy, balanced life, God willingly.

While holding the difficulty of today and the last few years in our hearts, our hearts are equally filled with hope for Mohamed's healthy future and coming chapters as we support him by his side.

Thank you all for being here today, and thank you, Your Honor, for your time, care, and consideration.

THE COURT:  Thank you, Ms. Suliman.

THE WITNESS:  Thank you.

MR. SCHELLER:  Your Honor, Mohamed Gafar.

THE COURT:  Yes, sir.  Tell me your last name.

THE WITNESS:  My name is Mohamed Gafar.

THE COURT:  Yes, sir.

Whenever you are ready.

THE WITNESS:  Thank you.

Your Honor, my name is Mohamed Gafar.  I am an Australian national based out of Rome, Italy, where I work as the head of the forensics investigation on cybercrime for the Office of Inspector General for the United Nations based out of Rome.

I manage digital forensic investigation in 120 countries.  And when I got the call about this hearing, I was in the Congo, Democratic Republic of Congo, and I was on a mission

until Saturday, two days ago.  That's where I took my first of many flights to arrive here at 3 AM this morning.

I had to be here to share just a few words about Mohamed and who he is to me, to my family.

The best part of my childhood memories were those shared with Mohamed and his family in Abu Dhabi until we were -- until I was about the age of 12, 13.

Then Mohamed and his family moved back to the States, and I moved to Australia.

Mohamed and I, we kept in touch.  And we used to share ideas about education and degrees that we wanted to study.  And we encouraged each other periodically, whenever we had the chance.  It was very different time zones Australia and the States.

When I knew about Mohamed's sickness, I was long gone by then.  I had moved to Australia -- I had moved to Rome and haven't spoke to Mohamed for about maybe 5, 10, 12 years.

Mohamed that I know and I grew up with was the example of a little brother.  He was kind, compassionate, decent, helpful, cheerful, and shy.

Although he was younger than me, when we were younger, I looked up to him.

THE COURT:  What's the age difference?

THE WITNESS:  Two years.  Yes, sir.

The kindness, commitment to excellence, the

compassion, and the passion to provide the best life to their kids, that was his family. And they extended that to me and my siblings and my family.

Engraved in me and my siblings, the best part of our childhood, until today, those days remain the highlight for me and my siblings. So when they heard about this hearing, they all wished they could be here with me today. But they are Sudanese nationals, so for them getting a visa on short notice, it's really difficult. So I am speaking on their behalf.

Your Honor, I just want to close by saying that Mohamed -- the Mohamed I know is loving, caring, an all-around amazing person who I considered not only my cousin but my younger brother. And I believe that he has so much love, so much compassion in him, and I know the love and care his family provides.

I don't personally work on the investigations of the evil crime conducted by ISIS, but I know the UN agency that is commissioned to currently do the -- in that region.

And I collaborate with them with guidance and support that my office needs to provide them.

THE COURT: You are employed directly with the United Nations?

THE WITNESS: Yes, sir.

I know the mechanism that ISIS operated by preying on young and vulnerable people, and I know that Mohamed's sickness

made him particularly vulnerable to their lies.

I truly wish he gets the chance to experience the life he didn't get the chance to live and share the beauty of his soul with the world.  And I sincerely thank you for your time, Your Honor.

THE COURT:  Thank you very much, sir.

THE WITNESS:  Thank you.

MR. SCHELLER:  Thank you, Your Honor.

THE COURT:  Okay.  Anything else?

MR. SCHELLER:  No, sir.

THE COURT:  Let's talk about the scheduling.

What I think we need from the government is a brief.

You have no additional facts to put into evidence, correct?

MR. BYRON:  In terms of witness testimony, no.

THE COURT:  In terms of any evidence, right?  Your argument is based strictly on the facts that are accepted in the PSR and the stipulation of facts?

MR. BYRON:  Correct.

THE COURT:  Okay.

And so your brief would lay out why those facts would show that the government has met its burden.  And it would, I guess, highlight the inferences, some of which you were going over today, that would have to be drawn from that to fit in the legal framework that would support this application.

How much time do you need to do that?

MR. BYRON:  Your Honor, I could have something filed by the end of the week.

THE COURT:  Okay.

Why don't we just say seven days?  You can have until next Tuesday.  You can certainly file it whenever.

How much time would you like, whichever of you is going to be doing it?

MR. SCHELLER:  I will be writing it.

Your Honor, I apologize, I don't have my calendar in front of me.  Seven days would be what day?

THE COURT:  Seven days would be the 31st.  You can have more time.  I mean, I would like to get this done.  I want to give you sufficient time to do it.  We can maybe work backwards from when the hearing would be.  Maybe that's a better way of doing it.  Although, if you don't have your calendar, that's going to be tricky, too.

MR. SCHELLER:  Your Honor, I would ask for the 14th. The reason is I have a number of hearings in between next week. So if I could just -- to avoid asking for an extension, if I could have until the 14th.

THE COURT:  August 14th is fine.

Then I have a four-week jury trial in Tallahassee beginning on August 7th, so that really occupies the whole of the month.  Will be back here the week after Labor Day -- the

week of Labor Day really would be the next time we can do it.

What's your schedule like that week, Mr. Scheller, or if you know.  We can also put it there, and if you have -- I realize you maybe weren't prepared for a --

MR. SCHELLER:  May I --

THE COURT:  Yes, sir.  That will be fine.  You can take a look at your phone.

MR. SCHELLER:  The week after Labor Day?

THE COURT:  The week of Labor Day.  Monday is the holiday.  The 5th, I will be here that week.  Actually supposed to be in trial with Mr. Byron, as a matter of fact.  So we can fit it in that week sometime during the trial.

If it's --

MR. SCHELLER:  Yes, Your Honor.  I think I have trial in front of Judge Burger, but I don't think that's going to trial.

THE COURT:  We will put it that week.  Then if your trial with Judge Burger goes, you can let us know, and we will find another time.  I will make a special trip over here if necessary.  I don't want this to go on any longer than necessary.

The following Tuesday would be on option, too.  That would be the 12th.  There is a lot of hearings on that day, too.

MR. SCHELLER:  The 12th of --

THE COURT:  September.  Yes, sir.

MR. SCHELLER:  That would be fine, Your Honor.

THE COURT:  Do you have a preference between the 12th and the week of the 5th?

It would be the week of the 5th -- if this trial goes, we would be in jury selection on the 5th.  It would be harder to fit it in on the 5th, but something else that week.  Maybe the 6th or the 7th.

MR. SCHELLER:  The week of the 12th is fine, Your Honor.

THE COURT:  All right.

MR. SCHELLER:  That's perfect.

THE COURT:  We will set it for the 12th itself, then. That's Tuesday, the 12th.

All right.

Keep that in mind.  You can have more time on your brief if you want to, but...

MR. SCHELLER:  I am going to go back to this thing that controls my life.

Your Honor, I am going to ask for the 21st.  I have a trial on the 1st.  I apologize.

THE COURT:  That's fine.  All right.  So August 21st for your -- and you are still good with a week, Mr. Byron?

MR. BYRON:  Yes, Your Honor.

THE COURT:  So, it would be the 31st for the government, the 21st for the defense.

If you think a reply would be useful, you can file one by the 28th. You don't have to file one, but if there is something jarring that you think would be better for me to be prepared, that would be good. And then you can do a surreply, Mr. Scheller. We don't need to keep going forever. I want to be as prepared as I can because this is a significant issue.

Anything else, Mr. Byron?

MR. BYRON: No, Your Honor.

THE COURT: You heard what I said before. I do hope this is a one-off and that these types of issues will be raised ahead of time in other cases.

Anything further from you, Mr. Scheller?

MR. SCHELLER: No. Thank you for your courtesy, sir.

THE COURT: Yes, sir. That's all for today, then.

Court is adjourned.

    (Proceedings concluded at 4:14 PM on Monday, July 24, 2023.)

                    * * * * * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. Any redaction of personal data identifiers pursuant to the Judicial Conference Policy on Privacy are noted within the transcript.

/s/ Lisa C. Snyder                          8/14/2023

Lisa C. Snyder, RPR, CRR                    Date
Official U.S Court Reporter